| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | Hearing Date/Time: September 12, 2012 at 9:00 a.m.<br>Objection Deadline: September 11, 2012 at 12:00 p.m. |

------------------------------------------------------- x
:
In re                                                         :    Chapter 11
:
B & M LINEN CORP.,                              :    Case No. 12-11560 (ALG)
:
                                      Debtor.    :
:
------------------------------------------------------- x

**MOTION OF THE UNITED STATES TRUSTEE FOR (I) THE
CONVERSION OF THIS CHAPTER 11 CASE TO A CASE
UNDER CHAPTER 7, OR, IN THE ALTERNATIVE,
(II) THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

      Tracy Hope Davis, the United States Trustee for Region 2 (the "United States Trustee"), in furtherance of her duties and responsibilities set forth in 28 U.S.C. § 586(a)(3) and (5), does hereby move this Court for an order (i) converting this Chapter 11 case to a Case under Chapter 7 pursuant to Section 1112(b) of the Bankruptcy Code, or, in the alternative (ii) directing the appointment of a Chapter 11 trustee in the above-referenced case pursuant to Section 1104(a) of the Bankruptcy Code. In support of the Motion, the United States Trustee respectfully alleges as follows:

### I.    PRELIMINARY STATEMENT

      The United States Trustee requests that the Court convert this chapter 11 case to a Chapter 7 case for two reasons. First, the Debtor is no longer operating, but there are assets available that can be distributed to creditors. The assets known thus far consist <u>inter alia</u> of an insurance policy and accounts receivable. Second, because of the facts of this case, it is clear that an independent fiduciary should be appointed so that the creditors can be assured that all the

assets will be collected and distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

In the alternative, should the Court decline to convert this case to a Chapter 7 case, there are ample reasons why a Chapter 11 Trustee should be appointed. As discussed in further detail below, this is a case where the integrity of the Debtor and its President have been questioned by several creditors. The allegations and information produced thus far suggest that this case should be administered by an independent fiduciary. To begin with, in January 2012, according to documents provided by a creditor, a Field Inspection Report by Consolidated Edison ("Con Ed") concluded that the Debtor was committing a theft of service. Specifically, despite running a commercial laundry facility where gas was being used for significant periods of the day seven days a week, the gas meter was manipulated in such a way that readings of gas usage were apparently not commensurate with the appropriate amount of gas being used. Additionally, the same creditor that provided the documents from Con Ed reported having a conversation with the Debtor's President in which the President allegedly showed the creditor how to disable the gas meter. While this conversation and the investigation all took place pre-petition, the very same management and officers of the Debtor have not changed. Moreover, while not dispositive, according to information provided by the Debtor's counsel at a hearing before this Court, the causes of the devastating fire that destroyed the Debtor's business on July 30, 2012, are still under investigation by the New York City Fire Department. For these reasons, if this Court should decline to convert this case to Chapter 7, a Chapter 11 Trustee should be appointed either for cause or in the interests of creditors, pursuant to 11 U.S.C. § 1104(a)(1) or (2).

## II.      FACTUAL BACKGROUND

**A.      General Background**

1.      On April 16, 2012 (the "Petition Date"), B & M Linen Corp. d/b/a Miron & Sons Linen Service (the "Debtor") commenced a voluntary case (the "Petition") under Chapter 11 of the Bankruptcy Code. ECF Doc. No. 1. The Petition was executed by Miron Marcus, President of the Debtor. Id. The Petition was filed by Joel M. Shafferman, Esq. of Shafferman & Feldman, LLP ("Debtor's Counsel"). Id.

2.      On April 24, 2012, Mr. Marcus filed a "Certification of Miron Marcus Pursuant to Local Bankruptcy Rule 1007-2" (the "Marcus Affidavit"). ECF Doc. No. 6.

3.      The Debtor is a New York corporation engaged in the commercial laundry business. Marcus Aff. ¶ 2.

4.      The Debtor's principal place of business and its principal assets are located at 220 Coster Street, Bronx, New York 10474 (the "Debtor's Premises"). Id. at ¶¶ 16–17.

5.      The Debtor rents the Debtor's Premises from 220 Coster LLC. Schedule G, ECF Doc. No. 9. Upon information and belief, Mr. Marcus owns and controls 220 Coster LLC.

6.      According to the Debtor, the purpose of the bankruptcy filing was "to sell substantially all of its assets pursuant to a plan of reorganization in this case." Marcus Aff. ¶ 18.

7.      To date, the Debtor has filed applications to employ two professionals. On April 24, 2012, the Debtor filed an application to employ Debtor's Counsel as general bankruptcy counsel. ECF Doc. No. 5. On May 5, 2012, the Court granted the application. ECF Doc. No. 13. On June 28, 2012, the Debtor filed an application to employ Burdzinski and Partners as "Special Labor Relations Consultant" to assist the Debtor in defending an unfair labor practice claim pending before the National Labor Relations Board. ECF Doc. No. 23. To date, an order

3

granting the employment of Burdzinski and Partners has not been entered by the Court.

8.  To date, the Debtor has failed to file the Monthly Operating Reports for June and July 2012 (the "June and July MORs").

9.  The Debtor continues to operate its business as a debtor-in-possession pursuant to Sections 1107 and 1108. No Official Committee of Unsecured Creditors has been appointed.

10. On September 5, 2012, the Laundry Dry Cleaning Workers and Allied Industries Benefit Fund filed a motion to covert the case to Chapter 7, or alternatively, to appoint a Chapter 11 Trustee (the "Union Motion"). ECF Doc. No. 39.[1]

**B.  Debtor's Pre-Petition Assets and Liabilities**

11. According to the Summary of Schedules, the Debtor has $900,000 in assets and $1,780,559.83 in liabilities. ECF Doc. No. 9.

12. Schedule B lists $900,000 in accounts receivable and unknown values for the following assets: (1) claims against "220 Laundry LLC, Eliot Spitzer, Michael Steinberg, and Adam J. Teller"; (2) five trucks; (3) miscellaneous office equipment; and (4) laundry operating equipment. Id.

13. Schedule F shows $1,780,559.83 in liabilities, of which $1.5 million is owed to Con Ed. Id.

14. At the Initial Debtor Interview conducted by a representative of the United States Trustee, the Debtor provided a copy of a "Certificate of Insurance Liability" dated November 9, 2011 (the "Insurance Certificate"). The Insurance Certificate is attached hereto at Exhibit A. According to the Insurance Certificate, the Debtor is insured for commercial general liability for

---

[1] Prior to the Union Motion, on August 15, 2012, the Debtor filed a Motion to Dismiss the bankruptcy case. ECF Doc. No. 31. On September 5 and 6, 2012, various parties in interest filed objections or responses to the Motion to Dismiss. See ECF Doc. Nos. 37, 38, 43, and 46. On September 7, 2012, the Debtor filed a Notice of Withdrawal of the Motion to Dismiss. ECF Doc. No. 48.

4

the damage to premises in the amount of $10,000 for each occurrence plus "excess/umbrella liability" in the amount of $10 million for each occurrence. Ex. A, Insurance Certificate.

C.    **Pre-Petition Claims Relating to 220 Laundry LLC**

15.    According to the Marcus Affidavit, the Debtor entered into an Asset Sales Agreement (the "Sale Agreement") to sell the Debtor's commercial laundry business to Eliot Spitzer in November of 2010. Marcus Aff. ¶ 3. The Sale Agreement was later modified and assigned to 220 Laundry LLC ("220 Laundry"). Id. at ¶ 3. On or about May 19, 2011, the business was sold for $9.6 million. Id. at ¶ 4.

16.    The Debtor alleges that 220 Laundry defaulted on the Sale Agreement on September 23, 2011 when it failed to make a scheduled payment of $41,667.67. Id. at ¶ 5. The Debtor alleges that as a result of the default 220 Laundry is liable to the Debtor in an amount in excess of $10 million. See id. at ¶¶ 5–7.

17.    In November of 2011, the Debtor commenced an action in the Supreme Court of the State of New York, Nassau County against 220 Laundry, Eliot Spitzer, Michael Steinberg, and Adam J. Teller (the "Sale Litigation"). Id. at ¶ 9. The defendants subsequently filed a counterclaim against the Debtor. Id.

18.    On June 14, 2012, the Sale Litigation in Nassau County was removed to the United States District Court for the Eastern District of New York, Case No. 12-cv-02982-JFB-WDW. On July 16, 2012, the Sale Litigation was transferred to the United States District Court for the Southern District of New York, Case No. 12-cv-05536-CM.

D.    **Pre-Petition Claims Relating to Con Ed**

19.    Prior to the fire on July 30, 3012, Con Ed supplied electric and gas meter service to the Debtor's Premises. Id. at ¶ 4.

5

20. According to documents produced as exhibits to an affidavit from counsel to 220 Laundry, Con Ed conducted a Field Inspection of the Debtor's premises during the period December 30, 2011 to January 3, 2012. See ECF Doc. No. 43-1. According to the Field Investigation Report, the initial inspection revealed "suspected theft" of service, and on January 3, 2012, the Con Ed inspector determined that there was a "theft of services." See id. Based on a review of the documents attached to the affidavit, it appears that the Con Ed inspection found that although gas was being used 14 hours per day, the gas meters were manually turned off, and for some portion of time, the records showed that there was zero gas consumption. See id.

21. On February 23, 2012, the Debtor entered into a pre-petition settlement agreement (the "Settlement Agreement") with Con Ed under the following terms:

> (1) The total charge for gas unmetered service for the Unmetered Service Period will be reduced by Con Edison from $2,503,272.36 to $1,600,000.00 and the associated late payment charges of $2,716,458.35 will be canceled;
>
> (2) The Debtor shall remit to Con Edison a payment of $50.000 on or before February 9, 2012, and another payment of $50,000 on or before February 22, 2012 to be applied to the adjusted unmetered gas charge of $1.600, 000.00 leaving an unpaid balance for unmetered gas service of $1,500.000.00;
>
> (3) The unmetered gas service balance of $1,500,000 shall be paid by 120 consecutive monthly payments of $12,500 due on the first day of each month commencing April 1, 2012. The deferred payment agreement shall be without late charges on the unpaid balance provided the installment payments required under this paragraph, along with the current bill payments, are paid timely and in accordance with the Agreement.

Id. at ¶¶ 7, 8.

22. On February 28, 2012, in accordance with the Settlement Agreement, the Debtor confessed judgment in favor of Con Ed in the sum of $1,500,000. Id. at ¶ 9. On the same date, a Confession of Judgment was entered in favor of Con Ed in the Supreme Court of the State of New York, Bronx County. Id.

23. According to the Settlement Motion, during the pre-petition period, Con Ed's

6

records indicated that the Debtor owed Con Ed $5.2 million for gas and electric service. Id. at ¶

5. This indebtedness arose because:

> Con Edison contended that during the period from December 30, 2005 through December 30, 2011 (hereafter, the "Unmetered Service Period") not all the gas being supplied by Con Edison and consumed by the Debtor was metered by Con Edison's gas meter, and that the amount of the gas service that was not metered and consequently not billed to the Debtor during the Unmetered Service Period equaled $2,503,272.36 (hereafter, the "Unmetered Service Charges"), plus associated late payment charges of $2,716,458.35, for a total balance of $5,219,730.71 . . . .

Id. at ¶ 6.

24.    On May 17, 2012, the Debtor filed a "Motion for Approval of Stipulation and Order (i) Restraining Consolidated Edison from Discontinuing, Altering or Refusing Service, (ii) Deeming it Adequately Assured of Future Performance and (iii) Assuming Prepetition Settlement Agreement By and Between Con Edison and the Debtor" (the "Settlement Motion"). ECF Doc. No. 14.

25.    On May 30, 2012, 220 Laundry filed a memorandum of law in opposition to the Settlement Agreement (the "220 Laundry Opposition"). 220 Laundry characterized Con Ed's claim as arising from the "theft of utility services" by the Debtor. ECF Doc. No. 18. According to the affirmation filed in support of the 220 Laundry Opposition:

> The Bankruptcy filing was precipitated by the fact that after years of systematically and regularly engaging in a theft of utility services from [Con Ed], the Debtor was finally caught. The theft of services was achieved by a physical tampering with the natural gas meter located at the premises where Debtor operated its laundry. It appears from Con Ed's investigation, that it was the practice of Debtor, which regularly operated three large commercial boilers, to disable the natural gas meter some 27 days out of 30.

ECF Doc. No. 17, ¶ 2(a).

7

26. On September 5, 2012, 220 Laundry filed an affirmation in support of an objection to a Motion to Dismiss, which is discussed below. ECF Doc. No. 44. In pertinent part, the affirmation states:

> As an Affidavit filed in the state court action recites, at one point after the sale, Debtor's President and sole owner, Miron Markus ("Markus"), brought 220 Laundry's principal, Eliot Spitzer, into the room where the gas meter was located and had an odd and awkward conversation wherein Markus showed Mr. Spitzer that it was "possible" to disable the gas meter by opening up a cover plate and removing a small component. It was not then clear to Mr. Spitzer whether Markus had in fact been doing so.
>
> Mr. Spitzer concluded that awkward conversation, then directed his General Manager, Christian Olsen, to attempt to determine whether the utility bills provided during due diligence were likely accurate. Obviously, the entire sale agreement had been predicated on represented financial data, including utility costs.

Id. ¶ 8–9.

### E. July 30, 2012 Fire at Debtor's Premises

27. On August 1, 2012, Debtor's Counsel filed a letter that notified the Court that on July 30, 2012 a "four (4) alarm fire" (the "Fire") destroyed the Debtor's Premises. ECF Doc. No. 29. According to Debtor's Counsel, the Fire caused "significant property damage, resulting in cessation of the Debtor's business operations . . . . the City of New York Fire Department and Department of Buildings is conducting an inquiry, and will decide whether the building, which houses the Debtor's business, can be rebuilt or must be torn down." Id.

28. At present, the condition of the Debtor's tangible Schedule B assets such as the five trucks, the miscellaneous office equipment, and the laundry operating equipment is unknown.

29. At present, the condition of the Debtor's books and records are unknown.

30. Upon information and belief, aside from the tangible property, the Debtor's

remaining assets are the accounts receivable and the insurance policy proceeds, if any.

31. On August 8, 2012, the Court conducted a status conference that covered, among other topics, the Fire and the issue of insurance proceeds. At the hearing, Debtor's Counsel indicated that the source of the Fire still under investigation. In response to a request by 220 Laundry, the Court ordered that any insurance proceeds awarded to the Debtor would be held in escrow by Debtor's Counsel until further order of the Court. On August 16, 2012, the Court entered the order requiring the escrow of the insurance proceeds. ECF Doc. No. 32.

### III.   DISCUSSION

**A.    Cause Exists to Convert the Case to Chapter 7**

As amended by the Bankruptcy Technical Corrections Act of 2010, Pub. L. No. 111-327 (Dec. 22, 2010), Section 1112(b)(1) of the Bankruptcy Code states, in pertinent part:

> the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

Section 1112(b)(4) contains sixteen examples of events that constitute cause for dismissal. In re FRGR Managing Member, LLC, 419 B.R. 576, 580 (Bankr. S.D.N.Y. 2009). The list of events under subsection (b)(4) is not exhaustive and courts may consider other factors. Id.; see also In re Gucci, 174 B.R. 401, 409 (Bankr. S.D.N.Y. 1994) (noting that the Bankruptcy Court was "not limited to the ten, non-exhaustive, enumerated grounds in 11 U.S.C. § 1112(b)(1)–(10) for finding cause."). The burden of demonstrating such cause rests with the moving party. In re BHS & B Holdings, LLC, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010); In re Ameribuild Const. Mgmt., Inc., 399 B.R. 120, 132 (Bankr. S.D.N.Y. 2009).

9

Among other enumerated grounds, cause for conversion exists where there is a "substantial or continuing loss to or diminution of the estate and the absence of reasonable likelihood of rehabilitation . . . ." 11 U.S.C. § 1112(b)(4)(A). "Section 1112(b)(4)(A) effectuates the purpose of § 1112(b)(1), which is to preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." In re Rand, No. 07-06801, 2010 WL6259960, at *4 (9th Cir. B.A.P. Dec. 7, 2010) (internal quotations omitted).

Courts conduct a two-step analysis to determine whether cause exists under Section 1112(b)(4)(A): (1) whether there is a substantial or continuing loss and (2) whether there is an absence of a reasonable likelihood of rehabilitation. FRGR Managing Member, 419 B.R. at 581. The first prong of this test may be met by showing that debtor is incurring administrative costs such as United States Trustee Quarterly Fees or legal fees of the debtor's professionals. FRGR Managing Member, 419 B.R. at 581. The second prong requires the court to find "more than simply an ability to reorganize; rather, it requires a showing that the debtor has sufficient business prospects to re-establish [itself] on a firm, sound basis." In re Om Shivai, Inc., 447 B.R. 459, 464 (Bankr. D. S.C. 2011) (internal quotations omitted).

Here, the Court has ample grounds to find that the Debtor's circumstances constitute cause for conversion under Section 1112(b)(4)(A)'s two-step analysis. First, under the substantial or continuing loss prong, the Debtor is and will continue to incur administrative costs that are exclusive to a Chapter 11 debtor. For example, the Debtor will incur United States Trustee Quarterly Fees as well as the fees and expenses of the Debtor's two professionals. Further, the Debtor must continue to pay rent on the Debtor's Premises. Given that the Debtor is

delinquent with filing the June and July MORs, it is unclear if the Debtor has sufficient funds to pay these obligations now that it is business has effectively ceased following the Fire.

The second prong is similarly met because the Debtor has no reasonable likelihood of rehabilitating itself in the near future. At present, the condition of the Debtor's tangible Schedule B assets is unknown. For example, Schedule B indicates that the Debtor owned five trucks, miscellaneous office equipment, and laundry operating equipment. If substantially all of these assets were destroyed in the fire, it is likely that the Debtor's remaining assets are the accounts receivables and insurance proceeds, if any. If true, it is likely that rebuilding the business based on the remaining assets would take years. In the interim, the Debtor's customers and clients would likely switch to the Debtor's competitors.

Taken together, the establishment of both prongs under Section 1112(b)(4)(A) demonstrates that conversion is in the best interest of the creditors. A Chapter 7 Trustee could effectively and efficiently administer the remaining assets of the Debtor in a manner that would maximize the value to creditors.

**B.    In the Alternative, Appointment of a Chapter 11 Trustee is Warranted**

The Bankruptcy Code is designed to allow a debtor-in-possession to retain management and control of the debtor's business operations. See In re Eurospark Indus., 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010). It is well recognized, however, that a debtor-in-possession owes fiduciary duties to the bankruptcy estate and must, among other things, "protect and . . . conserve property in [its] possession for the benefit of creditors" and "refrain [] from acting in a manner which could damage the estate, or hinder a successful reorganization of the business." In re Ionosphere Clubs, Inc., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (quoting In re Sharon Steel Corp., 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988)). "The willingness of Congress to leave a

11

debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee." In re V. Savino Oil & Heating Co., Inc., 99 B.R. 518, 526 (Bankr. E.D. N.Y. 1989). If a debtor-in-possession defaults in that respect, then the debtor may be dispossessed of its officer and alternative management may be appointed in the form of a Chapter 11 Trustee. See Schuster v. Dragone, 266 B.R. 268, 271 (D. Conn. 2001).

Section 1104(a) sets forth two separate standards for the Court's determination of the necessity of appointing a trustee. The Section provides, in pertinent part:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor. . . .
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor [ ].

11 U.S.C. § 1104(a)(1), (a)(2).[2] A finding of "cause" under Section 1104(a)(1) mandates the appointment of a trustee. Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.), 838 F.2d 1133, 1136 (10th Cir. 1988); V. Savino Oil & Heating, 99 B.R. at 525. The list of circumstances constituting "cause" for the appointment of a trustee is non-exclusive. In re Altman, 230 B.R. 6, 16 (Bankr. D. Conn. 1999), aff'd in part, vacated in part, 254 B.R. 509 (D.

---

[2] A number of courts have indicated that grounds for the appointment of a trustee must be established by "clear and convincing" evidence. See In re G-I Holdings, Inc., 385 F.3d 313 (3rd Cir. 2004). However, other courts view the burden of proof under the "preponderance of the evidence" standard. See Tradex Corp. v. Morse, 339 B.R. 823, 829–32 (D. Mass. 2006) (citing Grogan v. Garner, 498 U.S. 279, 286 (1991)). Cf. In re Bayou Group, LLC, 564 F.3d 541, 546 (2d Cir. 2009) (dicta).

12

Conn. 2000). Moreover, section 1104(e) of the Bankruptcy Code provides:

> The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief financial officer, participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting.

11 U.S.C. § 1104(e).

### 1. Cause Exists for the Appointment of a Chapter 11 Trustee Under Section 1104(a)(1)

Factors that courts consider under Section 1104(a)(1) include: conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence. Altman, 230 B.R. at 16. The "court need not find any of the enumerated wrongs to find cause for appointing a trustee." Oklahoma Refining, 838 F.2d at 1136.

Through Section 1104(a)(1), Congress has mandated that a Chapter 11 debtor-in-possession, who acts as a fiduciary of the bankrupt estate, be an honest broker. See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'"). When a debtor-in-possession, its management, or its professionals have exhibited an inability or unwillingness to comply with their basic fiduciary duties, there is but one remedy established by Congress to supplant management while allowing the case to remain in Chapter 11: the appointment of a trustee. See V. Savino Oil & Heating, 99 B.R. at 526 ("And if the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that stewardship of the

reorganization effort must be turned over to an independent trustee.").

This case is replete with information that provides cause for the appointment of a Chapter 11 Trustee, pursuant to 1104(a)(1). This information suggests that there has been fraud, dishonesty, or gross mismanagement on the part of current management of the Debtor. Specifically, Con Ed previously found theft of utility services as evidenced by its Field Inspection Reports. As a result of the inspections, the Debtor entered into a Confession of Judgment with Con Ed for the sum of $1.5 million, thereby suggesting at the very least recognition on the part of the Debtor that utility services had not been paid by the Debtor. Similarly, the origin of the Fire that destroyed the Debtor's business is still under investigation by the New York City Fire Department despite the fact that the fire occurred over one month ago. Finally, based on the facts elicited at the hearing before this Court on August 8, 2012, the Court determined that it would be appropriate to require that any insurance proceeds be placed in the escrow account of the Debtor's Counsel, as opposed to the Debtor's bank account, suggesting that the Court, as well as creditors, found grounds for a lack of confidence in the Debtor's credibility. In short, based on the information in the record, there is cause for the appointment of a Chapter 11 Trustee.

### 2. Cause Is Established Under 11 U.S.C. § 1104(a)(2)

Section 1104(a)(2) of the Bankruptcy Code allows appointment of a trustee even when no "cause" exists. See Sharon Steel, 871 F.2d at 1226; Ionosphere Clubs, 113 B.R. at 168 (Bankr. S.D.N.Y. 1990). Under Section 1104(a)(2), the Court may appoint a trustee, in its discretion, to address the "interests of the creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). See, e.g., Sharon Steel, 871 F.2d at 1226; Comm. of Dalkon Shield Claimants v. A.H. Robins Co., 828 F.2d 239, 242 (4th Cir. 1987).

14

Under Section 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and necessities." See In re Taub, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) (quoting In re Adelphia Communication Corp., 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006)); In re Euro-American Lodging Corp., 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007). As a court noted in Schuster:

> In determining whether the appointment of a trustee is in the best interests of creditors, a bankruptcy court must necessarily resort to its broad equity powers . . . . In equity, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests . . . . Moreover, equitable remedies are a special blend of what is necessary, what is fair, and what is workable.

266 B.R. at 272–73 (internal quotations omitted).

Accordingly, the standard for appointment of a Chapter 11 Trustee under Section 1104(a)(2) is flexible. See 124 Cong. Rec. H11, 102 (daily ed. Sept. 28, 1978); S17,419 (daily ed. Oct. 6, 1978). The House Report summarizes the reasons for Congress' adoption of a flexible standard for the appointment of trustees. The House Report, in part, reads as follows:

> The twin goals of the standard for the appointment of a trustee should be protection of the public interest and the interests of creditors, as contemplated in current chapter X and facilitation of a reorganization that will benefit both the creditors and the debtors, as contemplated in current chapter XI. Balancing the goals is a difficult process, and requires consideration of many factors.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 232 (1977), U.S. Code Cong. & Admin. News 1978, p. 6192.

Among the factors considered by the courts in assessing motions brought under this section include: (1) the trustworthiness of the debtor, (2) the debtor's past and present performance and prospects for rehabilitation, (3) the confidence – or lack thereof – of the business community and of creditors in present management, and (4) the benefits derived from the appointment of a trustee, balanced against the cost of the appointment. Euro-American

15

Lodging, 365 B.R. at 427.

Here, the appointment of a Chapter 11 Trustee is in the best interests of creditors because the only remaining assets are accounts receivables and insurance proceeds, if any. The Debtor's expertise in the commercial laundry business is no longer essential. A Chapter 11 Trustee could swiftly determine the value of the Debtor's remaining assets and administer those assets for the benefit of creditors. Accordingly, an independent fiduciary is necessary to restore confidence of the creditors in the liquidation of the estate for the ultimate benefit of all parties in interest.

## IV.   CONCLUSION

WHEREFORE, the United States Trustee respectfully requests that the Court (a) in the alternative, (i) convert this Chapter 11 case to a Chapter 7, or (ii) direct the appointment of a Chapter 11 trustee; and (b) grant such other and further relief as it may deem just and proper.

Dated: New York, New York
       September 8, 2012

                                        Respectfully submitted,

                                        TRACY HOPE DAVIS
                                        UNITED STATES TRUSTEE

                                By:    */s/ Michael T. Driscoll*
                                        Michael T. Driscoll
                                        Trial Attorney
                                        Office of the United States Trustee
                                        33 Whitehall Street, 21st Floor
                                        New York, New York 10004
                                        Tel. (212) 510-0500

# EXHIBIT A

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY):** 11/9/2011

**PRODUCER**
Phone: 516-869-8666  Fax: 516-465-7279
GENATT ASSOCIATES, INC.
3333 NEW HYDE PARK RD
SUITE 400
NEW HYDE PARK NY 11042

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**INSURED**
B&M Linen Corp.
T/A Miron & Sons Linen
220 Coster Street
Bronx NY 10474

**INSURERS AFFORDING COVERAGE** | **NAIC #**
--- | ---
INSURER A: Hanover Insurance Co. | 22292
INSURER B: Citizens Insurance Company | 31534
INSURER C: ACE Property & Casualty Insur | 20699
INSURER D: State Insurance Fund |
INSURER E: |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE | POLICY EXPIRATION DATE | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | GENERAL LIABILITY — [X] COMMERCIAL GENERAL LIABILITY — CLAIMS MADE [X] OCCUR — GEN'L AGGREGATE LIMIT APPLIES PER: POLICY / PROJECT / LOC | ZBY892427700 | 11/10/2011 | 11/10/2012 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $10,000 |
| | | | | | | MED EXP (Any one person) | $5,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| B | | AUTOMOBILE LIABILITY — [X] ANY AUTO / ALL OWNED AUTOS / SCHEDULED AUTOS / HIRED AUTOS / NON-OWNED AUTOS | AWY892844400 | 11/10/2011 | 11/10/2012 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY — ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN AUTO ONLY: EA ACC / AGG | $ / $ |
| C | | EXCESS/UMBRELLA LIABILITY — [X] OCCUR / CLAIMS MADE — DEDUCTIBLE — [X] RETENTION $10,000 | M00525698 | 11/10/2011 | 11/10/2012 | EACH OCCURRENCE | $10,000,000 |
| | | | | | | AGGREGATE | $10,000,000 |
| D | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY — ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | 21515648 | 7/1/2011 | 7/1/2012 | [X] WC STATUTORY LIMITS / OTHER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| | | OTHER | | | | | |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**
CERTIFICATE HOLDER IS INCLUDED AS ADDITIONAL INSURED, ATIMA

**CERTIFICATE HOLDER**
AVENDRA, LLC, C/O COMPLIANCE SERVICES CORPORATION
PO BOX 2750
MONTGOMERY VILLAGE MD 20886

**CANCELLATION**
SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

**AUTHORIZED REPRESENTATIVE** *Leslie R Genatt* (signature)

ACORD 25 (2001/08) © ACORD CORPORATION 1988